County and the state of Derrick Monroe. How can it happen that a jailer observes a suicide in progress by strangulation from start to end and that he doesn't have any doubt that it is a legitimate suicide attempt the third that weekend, the fourth that they know about in two weeks, and that he informs everybody of authority at the jail, the sheriff, the jail administrator, the deputy sheriff, and yet no one timely intervenes in time to prevent brain death, and not a single one of them. Because there's a very legitimate regulation or custom or practice to protect the officers from entering a cell alone, you know that. I disagree, Your Honor, because you disagree that there was not a legitimate you disagree that there was that policy or you disagree that such a policy would ever be constitutionally reasonable. I disagree that a policy that has only one jailer on nights and weekends with a do not enter alone instruction is ever a policy that can be constitutional that is ever a policy that would be reasonable. There are so many alternatives to that that is not necessary to prevent what happened here. It's the interaction of multiple policies that caused what happened here. It happens what happened here as a result of multiple interacting policies and not simply the one policy to try to protect a jailer upon intervening, but there were multiple policies that acted to cause multiple delays. First, we presented summary judgment evidence to show that there was a policy that the jailers delayed calling 911 until they entered the cell, and then that delay was compounded by a delay in having one jailer on duty nights and weekends. And you're well aware that that was the one constitutional issue we reached in the last round and found that that is unconstitutional, but it just was not clearly established, which is why laws was able to get qualified immunity. But your opponent says we don't have we certainly are not saying don't call 911 right away. So on that one, that's clearly unconstitutional. Where can you point to a rule that says they tell people not to call 911? The we assert that that's a de facto policy and that the evidence shows that. Well, do you have any evidence besides this case? No. In other words, anything so I'm not in any way saying that what was done here was perfect. But but if there's a mess up on one day, that does not necessarily establish a policy on the part of the community, the city, the county, the whatever. But we believe there are evidence does show that that can you tell them that? Yes. Yes. What we have here is is we have four people acting at the same time, all doing the same thing, all not calling 911. If this had happened outside in the public, you would have had a dozen or more calls to 911 with people observing strangulation and process. How does it happen that four officers, two police officers and two jailers, not a single one of them calls 911 with an active suicide in progress, observing that this man is strangling to death? It can only be reasonably explained as a result of policy. And that's also reflected in the fact that who makes the call? Who makes the call to 911? It's Rixey, the jail administrator. Under their official policy, it should have been Laws. Laws was the one that was supposed to make the call because he originally observed it. That's their formal policy. But he doesn't. It's Rixey that makes the call because she's the one that first goes into the jail. And her testimony is that she doesn't testify that there's been any discussion between her and Laws with respect to whether Laws has called 911. And as soon as she determines that Derek Monroe is not breathing, she says she exits the cell and goes right to the phone outside the cell and calls 911. Now, if you think about that, that's an extraordinary assumption that she's making. She's assuming that her employee has not followed the official policy, the written policy of calling 911, that nobody has called 911, and that she's making the first call to 911. And her employee has stood there for the past five minutes while she's been going to the jail and watched this man commit suicide and strangle and not reach over to the phone that's within arm's reach and call 911. Does he testify that he doesn't know why he did not call 911? Is that correct? Well, that's what he said. We think he knows perfectly well why he didn't call 911. It's the same reason that Brixen—nobody would assume that. Nobody would reasonably assume that without at least asking whether he called 911, but she doesn't have any doubt about it because she knows that's the policy. Nobody's going to call 911 until they first enter the cell. And Jailer Lancaster helps fill the beans on that when we were able to take her testimony on remand. She testified that in an emergency, when only one jailer was on duty, they were instructed to call the sheriff, to call the deputy, to call the administrator, automatically to call those three, but not automatically call 911. Now you already have an emergency that's sufficient to call half the jail staff to the jail, to call the sheriff, the administrator, and the sheriff's deputy, but it's not a sufficient emergency to call 911. She says, well, first we have to assess the severity of the condition, and in practice we can see what that means. In practice we can see that that's really what they do is nobody calls 911 until they go into the cell, and then they call 911. Even when they have this—it's so ingrained in them, they have this tunnel vision about it, that even when they see this man strangling to death for over five minutes and everybody knows that he needs help, nobody calls 911. Nobody's surprised about it. Did you find any other evidence of that ever happening? It happened the day before. Laws did the exact same thing. He watched Derrick Monroe jump off the bunk with a sheet tied around his neck and fall on the floor, and didn't intervene to stop it, and did not call 911, waited for the sheriff to get there, and then the two of them transferred him to another cell. Now, he didn't—he ended up not strangling himself that time because the knot gave away, but if the knot hadn't given away and he had crushed his trachea on that attempt, the exact same thing would have happened on Saturday. He would have died on Saturday instead of Sunday because of the policies. I appreciate these points, and I appreciate, you know, that you're very much in favor of your side, but I'm trying to—let's put this particular person aside. Are you asking if there's a pattern? I'm asking any other person that was in the jail besides this particular person. No, we don't have— Any other evidence that someone else—got sick, or, I mean, putting aside the suicide issue, not sick, lying there, not breathing, whatever, whatever, and 911 was called. And that's a point that we make, that the policies would prevent a timely intervention to protect somebody that was choking to death. Right, but that's why I'm asking. And you're saying, do we have any other examples where that's happened? No, and neither did they in Sanchez v. Young. They only had the one incident in Sanchez v. Young where they allowed the case to go forward. We have the same situation here. You can have just one injury that's occurred from unconstitutional policies, and the court committed the same error here as in Sanchez v. Young by not considering how these policies interacted to cause Derek Monroe's death, as a moving force in Derek Monroe's death, and not considering them, our alternative theory, that these were enduring conditions of confinement that were in place all the time and ought to be treated as conditions of confinement. The jail had these policies, and in fact, not just on the weekends, but at night. So eight-hour shifts at night, 48 hours over the weekend, that's more than half the week. Every week that these policies are enforced, that delay timely intervention to provide protection from self-harm and to provide timely intervention to allow for emergency medical aid. More than half the time, this jail is being operated unconstitutionally because you can't intervene timely. It doesn't have to . . . Well, tell us what, in your view, would be the minimum. Not a perfect policy, but the minimum constitutional policy. Would it be a policy, for example . . . Let me finish my question. Would it be a policy, for example, that could say that you can never have a single jailer there? Would it be a policy that said you do not enter policy or rule if there's only a single jailer? Would it be a policy that 911 has to be called within a specific period of time? What's the constitutional minimum, in your view? In my view, the constitutional minimum is policies that allow for intervention within five minutes when breathing has been compromised. And that could occur here in a number of different ways. One of the policies that so aggravated this, or two of the policies that aggravated this, the time delays is having the long phone cord and the failure of the jailers to maintain their current suicide prevention training. Those significantly aggravated it. If you had a . . . And the reason they aggravated it is because it serves no purpose to have the long phone cord. That just makes everything all the more dangerous. But the suicide prevention training gave them alternatives to what they were doing, such as using trustees and volunteers and other alternatives, such as clothing laws, the jailer with discretion to enter the jail cell when he thought it was safe. Now, they had a trustee in the adjacent cell. That was, in fact, one of the reasons that the district court originally said it was deliberate indifference, because they had a trustee they could use as backup. And they didn't. But apparently that's their policy, not to use the trustees as backup. But that was available to them so that they could make timely intervention within five minutes and provide rescue. And they also could have clothed laws with discretion, just like they did when they allowed laws to take Derek alone outside of the cell to a shower to clean himself from defecation, literally five minutes before Derek ended up committing suicide. So the problem is they have this inflexible policy, this inflexible do not enter policy, that keeps them from having timely intervention and turns their suicide watch program into a meaningless watch-only program, because they never can intervene timely to provide the protection the Constitution requires. I know that's a very long answer, but that's the answer to my question, that they have to have a collection of policies in place that allows them to provide emergency medical aid to a detainee who obviously needs it, who's had his breathing restricted within five minutes so that he doesn't suffer irreparable brain injury. And they could have easily done this here, but didn't care to do so. Now, am I right in thinking that the district court didn't, you know, mainly focused on episodic claims as opposed to conditions of confinement? Focused only on one episodic claim. And so your view is that that by itself is problematic, that the district court didn't look at the conditions of confinement. It is, in our opinion, reversible and harmful error that the court considered only one of the five policies. Did you discuss conditions of confinement in your amended complaint? Yes. We pleaded it in the alternative. We pleaded conditions of confinement. But I would also say that all we are required to do in the complaint is plead facts that raise it. But we did plead the theory in the alternative, and we argued it in our summary judgment response. And we told the court that it had failed to consider it in our motion for rehearing, and the court took that as an attempt to raise it for the first time after his decision on a summary judgment motion, which was simply not the case. We had raised it all the time. And we had said, we had also said, if for any reason you think we have not pleaded it sufficiently, we want to amend and replead and plead it with more specificity. I don't think that was necessary. That was not an abundance of caution. But lo and behold, now that's exactly what we're hearing from the appellees in their brief. They're saying we didn't plead it sufficiently. So let me ask you this. I'll give you a hypo. What if we agree that the district court should have considered it but didn't? Should we send it back for that, or should we decide it? Well, that is your option. And the defendants want you to decide it in the first instance because they're saying it didn't make any difference. So you should go through the policies in the first instance and address this for the first time instead of sending it back for the district court to do. Here, I agree with the defendants, actually, Your Honor, because there have been so many delays and this case has been pending so long. And we've had two appeals. I don't want to be back here for Cope III. I would prefer for you to address the issues and give the court as much guidance as possible so we can get this case to trial as quickly as possible and have Mr. Monroe's rights and his family's rights vindicated. Essentially, the jail's response boils down to, we can run a constitutional jail on nights and weekends, but the Constitution doesn't take weekends off. All right. Mr. Thomas, your initial time has expired. You save time for rebuttal. Thank you. Mr. Hogg. Good morning. May it please the Court. John Mark Hogg on behalf of Coleman County. Your Honors, at the outset, I want to get to a couple of the questions that I heard from the Court quickly, but in essence, where this case is now is the only issue that wasn't really considered in the first appeal was the issue that had been raised about the staffing question, because that was an issue that was a policy issue that the Court did not address. Okay. Let's be super clear. Okay. All right. In the prior opinion, the only constitutional issue we addressed as whether it was constitutional is failing to call 911. All the rest were under point two, clearly established, which is only under qualified immunity and not under Monell. So you may be sorry to be seeing me since I was on the prior panel, but I will tell you, we did not rule on the constitutionality of anything else, just the clearly established other than the 911. That's all I want. Thank you for that clarification, Judge. I would not presume to tell the Court what it ruled on. Well, it's very clear if you read the opinion. All right. Thank you, Your Honor. My mistake. Okay. So given that, how can you defend the policies? Because for example, if you had an unconstitutional policy, but the employee followed it, well, then the employee could get qualified immunity, but the city or the county should not, right? Well, they don't get qualified immunity, but they shouldn't win, right? And that's a hypo. Let's assume that you had an unconstitutional, not obvious, like go around murdering people or something, which, you know, anyway, but not a clear unconstitutional, but it was unconstitutional. Okay. But the employee is following the rules that are given to him or her. So we give them qualified immunity. That would not end the matter, the Monell and the suing of the county, would it? Not necessarily, Your Honor, because you have the constitutional violation. You have, obviously, to get to the Monell issue, you have to have the constitutional violation first. And if the Court finds in this case that there's a constitutional, there was a constitutional violation in one of these, that gets past the first step. If you get to the point to where you get to the policy issue, then you still have a deliberate indifference component on the policy that comes back to, did the policymaker, did the official policymaker have objective deliberate indifference to that risk at the time? And in this case, what we have is a complete lack of that, because we don't have any informed of the risk. There's the talk about the memorandum from the state, which he had never seen. He had never experienced a suicide or an attempted suicide with a phone cord before. He had never had, and there was no testimony, actually, that there had been a prior suicide attempt in this jail. There was never any evidence that he had made an issue of that with the Commissioner's Court when it came to staffing. They had never, there was no evidence that there had ever been a suicide attempt or an emergency attempt during the nights or on the weekends when we had only one jailor. But the problem is, I mean, I totally understand when you have rules for sort of the average day. But then there's an emergency, and all of a sudden things will change. Why wouldn't that be the case in a prison? There's going to be emergencies, even putting aside the issue of suicide. People getting sick, people having some problem. There can be all kinds of emergencies in prisons. I've seen that throughout my time on the Court. Certainly. So why wouldn't that be something you would have a policy on to address, even if the normal la, la, la is one thing, that you would have something to address  Why isn't the failure to do that itself a problem? Your Honor, I don't, I think you have to do that in the context of when you're creating a policy. There has to be, there has to have been, if what we're saying is that violate, that incident, that emergency that could occur, were they deliberately indifferent in not having or foreseeing something that might happen in the future that they had never had any experience with. That's where I think the deliberate indifference component on the policy under Monell is so important. Because you're trying, what they're, what Monell is clearly saying is that we're not going to impose respondeat superior liability upon the county in this situation. There has to be something that the county did, a policy that they intentionally and knowingly did, created, knowing the, knowing what the risk was. In this case, we don't have that. When we talk about going back to the staffing policy, the issue there is that is based upon the budgetary requirements set out by the Commissioner's Court. There hasn't been any evidence introduced that the Commissioner's Court ever had any issue, had any issue brought for them or given them notice about that as far as the risks that that would entail. Getting, addressing the, one of the questions that was raised by a proposing counsel was the Sanchez opinion and citing the Sanchez opinion as the basis for one, having one incident can be sufficient to establish that policy. Of course, Sanchez was going through the conditions, it was a conditions of confinement and episodic acts commission case, but what the court found in that case is that there was a long, long evidence of the policy of failure to assess individuals that came in, that came into the jail, and not medically assessing them before, and in this case, you had a suicide attempt that took place out of the jail, was brought in, and they had a policy of just letting the inmates sleep it off. The other issue is the argument about having a trustee as backup or having someone else to go in there with you. What you also have to realize is jail staff are trained and met certain requirements. There are certain requirements that the jail commission requires to do that, to have a, to argue that you can just have a trustee without any special training, who himself is an inmate of the jail, to go in as far as a backup for security, just doesn't work in the real world. This is not a security issue. If we're talking about a suicide attempt, having somebody to go in there with them in an emergency situation is very different from having someone go in because of a security issue. That can be the case, but I think the security issue has to do with not exactly knowing what is waiting for the jailer when he goes into the cell. That's one of the reasons for waiting for backup because in this case, his initial reaction was from laws, the testimony on the record, I don't have the record site, but was he wasn't a hundred percent sure whether he was being effective with the phone cord. He had just been causing a ruckus and banging the cell with the plunger and the phone on the wall, trying to get his clothes back, which was what the issue that started all this was. With that kind of an incident, he doesn't really know exactly what he's facing. Is the person effectively committing suicide? Is he really trying to commit suicide or is he trying to lure a jailer into the cell? I think that's why you have to have the policy that says, without backup, don't go into the cell because you don't really know until you're in there what exactly is happening. They still respond to it as if the suicide is taking place. Then why not call 9-1-1? He should have called 9-1-1. Okay. Where is that policy? The policy is set out, I've set it out in the brief, but I can't specifically say, but it's in the jail policies that basically says in the case of a suicide attempt, what it says is the jailer is to call for backup and go into the cell, call 9-1-1 immediately, call for backup. Actually, I think it's call for backup, call 9-1-1, and once backup arrives, go into the cell and begin emergency procedures. Okay. I believe that's what the policy says. Do you have that ROA? I believe that's in the brief, Your Honor. I mean, I know you referenced it, but I just want to make sure I have it. Yeah. It's one of the jail policies. It's a written jail policy. When we get down to that issue, then what we have is not a . . . Mr. Laws was not complying with jail policy. He was not complying with jail policy. It was a violation of jail policy not to do that. He can't explain why he didn't do it. Probably the stress, the situation, we're all human. I'm not arguing before this Court at all that this case was perfect in any stretch of the . . . It's a very sad case. Yes. It's a very sad case. We all have to follow the law regardless of what we think personally, but it's a very sad case. It is a very tragic case. Going back to the issue, the only argument they have as far as evidence to try to prove a de facto policy or a pattern of practice is the argument that you have four individuals, all who don't call 911. One, the person who had the obligation under the policy to call 911 was Laws. He had called for backup. No one else called 911 until Brixie arrived. It also makes sense that that would be the situation that you would put that burden on the jailer who was there present. The other individuals were not present, were not observing what was happening, could not assess that situation. It's a tragic set of circumstances, but the risk to laws of going into the cell was too great based upon the policy, and he complied with the policy to not go in the cell. He violated the one policy that this Court recognized in the appeal below as to not calling 911. The evidence of four people in the same incident not doing something is not evidence of a pattern of practice. There's no evidence that was brought forward. The argument they tried to make with Ms. Lancaster's testimony was that they were told not to call 911 until they had assessed the situation. The testimony Ms. Lancaster has set out in the brief was actually that, yes, I actually did . . . we were instructed and trained by Ms. Brixie to call 911. That was the policy of the jails to call 911 if that situation was happening. Why would Ms. Brixie assume that that hadn't been followed when she arrived? I'm sorry? Why would Ms. Brixie assume that that hadn't already occurred when she arrived? I don't know. I think it's a stretch of the argument to say she assumed anything. She got there, assessed the situation, and I don't know . . . I don't recall if there was any testimony about them talking as to whether that had been done or not. But she instructed him or he instructed her to call 911 at that point once they got in and assessed . . . Who instructed who? I'm sorry. I can't recall. I believe Mr. Laws said, can you get me the breathing mask? And then she went and called 911. And I can't recall if Mr. Laws told her to call 911 or if she just called 911. I'd have to go back and look at the record on that. Are there any other questions? All right. Thank you, Mr. Hogg. Mr. Thomas for rebuttal. Mr. Hogg was incorrect that we have to show deliberate indifference on a conditions of confinement claim. Conditions of confinement do not require showing of either an underlying act of deliberate indifference or that the policy was adopted with deliberate indifference. If you look at the second Sanchez v. Young case, the term deliberate indifference isn't even contained in that case because it has no relevance to conditions of confinement. What we have to show is that they were pervasive practices not reasonably related to a legitimate government objective and caused a constitutional violation. That's what we endeavored to show. With the combination of these practices that kept them from having a legitimate suicide watch that could provide the intervention the Constitution requires and to provide intervention for timely medical treatment when you have the potential for brain injury as a result of your breathing being restricted. We also don't have to prove actual notice of the dangers of these policies on a Monell claim. The court has repeatedly said that constructive notice is sufficient for Monell. We cite Moore v. LaSalle Management in 2022 for that proposition. LaSalle says constructive notice is attributable to policy makers when they would have been on actual notice had they properly exercised their responsibilities. Here, had Brixey and the sheriff properly exercised their responsibilities to stay up to date on jail standards, they would have known that the phone cords were excessive length and a suicide risk. Therefore, they are charged with notice of that. If they had stayed up to date and properly exercised their responsibilities, they would know that their policies were ineffective and dangerous in not allowing timely intervention of either medical authorities or jailers to prevent harm. All right. If we were to end up reversing on any aspect of this, what would happen next? Hopefully trial. But, I mean, if you just sent it back, if you just said the court didn't consider all the issues, we want the court to consider it in the first instance, then we'll, you know, see what the court does. You know, my suspicion is we'll be back here on Cope 3 if you do that. So, I hope you write with sufficient specificity to have direction for the court. Now, if you think we're wrong, you know, we don't have the evidence to have done that. And in the case, I think that would be wrong. I think that would be an egregious miscarriage of justice. But this case, unfortunately, was caught up in COVID and that delayed things a long time. Then we took the detour to the Supreme Court. We thought we had a legitimate chance at the Supreme Court. We did get a dissent from Justice Sotomayor. So, I mean, it was a legitimate attempt to go to the Supreme Court. So, there were lots of delays before this got back to the trial court. And I think there was some judicial fatigue with the fact that the case has been around for so long. But what I would hope is if you remand to the trial court, that we would quickly get to trial and get a judgment in this case. Thank you. Thank you, Mr. Thomas. Your case is under submission. The court will take a vote.